1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**
10         **EASTERN DISTRICT OF CALIFORNIA**
11         **FRESNO DIVISION**

12   RAHEEM R. MUHAMMAD,                    Civil No.        06-0549 MLH (AJB)

13                              Petitioner,
                                            **ORDER DENYING PETITION FOR**
14   vs.                                    **WRIT OF HABEAS CORPUS**

15   ROY A. CASTRO, Warden,

16                              Respondent.

17

18   **I.     INTRODUCTION**

19          Raheem R. Muhammad, a state prisoner proceeding pro se, filed a Petition for Writ of Habeas

20   Corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of

21   California challenging his Fresno County Superior Court conviction in case number F01659650-6 for

22   first degree murder, second degree robbery, and assault by means likely to produce great bodily injury,

23   in addition to various enhancements found true by the jury.  (Rep's Tr., vol. 36 at 10508-10.)

24   Muhammad claims the jury was improperly instructed with regard to the special circumstance allegation

25   of murder committed to facilitate a robbery, his Eighth and Fourteenth Amendment rights were violated

26   because California law does not properly distinguish between a special circumstance offender and a non-

27   special circumstance offender, and there was insufficient evidence to support his conviction for murder

28   during the commission of a robbery.  (*See* Pet'rs Attach. A-C.)  Muhammad also states that he joins in

any arguments submitted in any petitions filed by his co-defendant Odell Muhammad.  (Pet'rs Attach. D.)

The Court has considered the Petition, Petitioner's Memorandum of Points and Authorities in Support of the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, the Lodgments submitted by Respondent, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Petition is **DENIED.**

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The relevant facts as found by the state appellate court are as follows:

### Assault at the Market (Counts II &  III)

On December 8, 2000, Ricardo Hernandez drove his brother-in-law, Jose "Red" Delatorre, on various errands.  Around 5:00 p.m., after sunset, they stopped at the Jensen-Walnut Market in Fresno because Delatorre wanted to buy cigarettes. Hernandez waited in the parking lot and remained in his red car.  He left the engine on and put the car in "park."  The headlights were also on.  Hernandez testified he had only been in the market on one prior occasion and was not a regular customer.

Delatorre entered the market and purchased the cigarettes from the clerk without incident.  Delatorre had just cashed his paycheck and had $400 to $500 in his pockets. As he walked out of the store, an African-American male teenager approached and asked ""What's up, man?"  About eight to 12 people suddenly surrounded Delatorre.  They beat and kicked Delatorre and he fell to the ground.  As Delatorre described it, "[T]hey had me there like a ball in [sic] the ground," and "I don't think there was any place that they didn't hit me."  Delatorre tried to get up but they repeatedly kicked him back down. He tried to cover his head and face from the kicks as he was being beaten, he felt the assailants stick their hands into his pockets and remove his money.  The assailants took all of Delatorre's cash and he was just left with some pocket change.  Delatorre testified we would have given his cash to the assailants if they had asked, but they never asked.

In the meantime, Hernandez was still in his car and watched as about 15 people surrounded and beat Delatorre.  Hernandez testified the assailants pushed, punched, and kicked Delatorre so that he was almost suspended in midair.  Hernandez stepped out of the driver's side door and asked, "What's happening?  How come you guys are fighting." Hernandez testified that three or four of the assailants left Delatorre and headed for him. One individual punched Hernandez in the right and left temples.  Hernandez testified he was unable to see that person's face because it was dark and he just saw "stars" from being punched in the head, but he did not fall down or lose consciousness.  Hernandez described the assailants as African-American and wearing dark clothing, and some "looked older, but they were younger."  The person who punched him had red bandanas wrapped around his hands.

Hernandez opened the driver's door and tried to get inside his car. One of the assailants kicked the door, and the door hit Hernandez's leg. Hernandez got into the car and locked the doors. His assailants returned to Delatorre, who was still on the ground, and resumed their assault by kicking him again. Some of the individuals seemed to move toward the car again but, at that moment, the clerk emerged from the market and yelled at them. One of the assailants kicked the driver's side window and the glass shattered on Hernandez. Delatorre rose form the ground but an assailant kicked him down again. Hernandez thought the assailants were going to kill Delatorre, but they suddenly scattered and left the area. Delatorre managed to get up but he was doubled over in pain. He retrieved his wallet from the ground and headed for the car. Hernandez leaned over and opened the passenger's side door. Delatorre got inside the car and told Hernandez to get out of there before they returned. Hernandez drove out of the area without incident. Delatorre thought "it was a miracle" that he escaped.

Delatorre's face and mouth were bloody and bruised, and his eyes were "very red" with blood. He also lost a front tooth. He was treated at the hospital the next day and reported the incident. As of trial, Delatorre continued to suffer from headaches, pain in his neck and back, and still did not feel "completely well." It was stipulated that Delatorre suffered great bodily injury within the meaning of [Penal Code] section 12022.7.

N.G. was 14 years old and lived across the street from the market and saw the assault. He was playing outside with his younger brother when he saw a group of eight to nine African-Americans walking around the market. They were wearing dark clothes and N.G. recognized them as being from the neighborhood. N.G. testified that someone from the group circled around Delatorre. Another person asked Delatorre for a "light," referring to a cigarette, and then pushed him. The rest of the group began to hit and push Delatorre back and forth, and he fell down. Once he was on the ground, they repeatedly kicked him hard.

N.G. testified that one member of the group, who had been hitting Delatorre, stopped the assault and told everyone, "Stop, that's enough." This person also said, "Let's go," and "Leave him alone." This person stopped hitting Delatorre but the others continued the assault.

N.G and his brother ran into their house and told their mother that someone was being beaten across the street and to call the police before he was hurt or killed. Their mother looked outside and saw four to six Black males beating a man on the ground. She recognized the assailants as being from the neighborhood. She called 911 and described the assault as she watched it.

Another person watched the assault from Estelle Howard's house, across the street from the market. Ms. Howard lived there with her son, Leroy Howard. Her other son, Anthony Pruitt, Sr., was a frequent visitor. On that particular afternoon, Ricky Pierson was visiting Ms. Howard's residence. Pierson had grown up with the Muhammad family and knew its members very well.

Pierson was sitting on the porch at Ms. Howard's residence, across from the market, when he saw a group of the Muhammads turn the corner. They approached a man who was smoking a cigarette. The man was standing by the bus stop in front of the market. Pierson testified it was too dark to see the man's face, but he subsequently realized that man was Delatorre.

Pierson testified the market's spotlight illuminated the Muhammads, and he recognized Raheem and Odell. Odell was also known by the nicknames of "Yack" or "Yacky." Pierson also recognized S.M. M.M., C.A., Kevin, Abdullah, F.K.M., and M.H.

3

Pierson admitted he was not sure who was in the group, and might have mistakenly said Willie and H.M. were there.

> "If you knew all the Muhammads, as far as the teenagers, they are just like that, no matter where they go, they all just like that. So, sometimes you can mistake someone being there because they always together."

Pierson testified these people surrounded Delatorre and, within seconds, began to hit and kick him. Pierson testified that Raheem participated in the assault but he was unable to see exactly what Odell was doing. C.A. and M.M. "mostly" just stood around "like aggravatin' it on," by yelling and shouting. There was "[a] lot of talkin' and . . . you would say gang call, cuss — cuss that."

Pierson did not see Hernandez get out of the car, but he heard Hernandez say something in Spanish. Delatorre repeatedly tried to get back to the car but failed. Pierson testified the group also kicked the car, threw stuff at it, and busted a car window. Pierson thought the car was blue but later learned it was red. Pierson testified the store clerk emerged from the market and said he was going to call the police. Delatorre finally made it into the car and the Muhammads left the area. Pierson believed the entire incident lasted about 10 minutes.

At trial, Pierson admitted that he knew Delatorre from previous contacts in the area. Pierson frequently purchased crack cocaine for Delatorre from a member of the Muhammad family in the neighborhood. They usually met at the market to conduct their transactions. Pierson conceded Delatorre might have contacted him earlier that day but he was not sure. Pierson testified he used crack cocaine on the day that Delatorre was assaulted, but "it wasn't that much."

Pierson admitted he was previously addicted to crack cocaine, but he had gone through a rehabilitation program. In 1996 and 1997, he was convicted of possession of cocaine for sale, based on drug transactions with a member of the Muhammad family.

By the time of trial, law enforcement officials had relocated Pierson from Fresno, at his request, because he feared for his safety in this case. Pierson had received financial assistance for the relocation, but such assistance was discontinued when he suffered misdemeanor convictions for domestic violence and insufficient funds in 2001 and 2002. Pierson did not receive any beneficial treatment for any of his convictions in exchange for his testimony in this case.

Also at trial, Delatorre admitted he had stopped at the store on prior occasions, but claimed he was unfamiliar with the area and did not know anyone there. Delatorre subsequently admitted, however, that he used cocaine "now and again," and he purchased rock cocaine from a young African-America man outside that market on a previous occasion. Delatorre did not know that young man and just saw him on one occasion.

Delatorre also admitted that he knew Ricky Pierson, and they purchased and used narcotics together. Pierson would meet a contact and then return with the drugs. Delatorre testified he would "go for a while, then I would leave," and he went about once a month for one year. He bought small amounts of drugs and did not use his entire paycheck on narcotics. He conceded he was not unknown in the area, but "to these people maybe I was unknown." He also bought drugs in other areas.

Delatorre testified that he did not go to the market that day to purchase narcotics. Delatorre had consumed three beers earlier in the day. Delatorre admitted he was

convicted of felony assault with a semi-automatic firearm in 1989, and felony driving under the influence in 1994.

Delatorre identified Odell from a photographic lineup as the young man who approached him outside the store and asked, "'What's up?'" He testified that he was positive about his identification of Odell. Delatorre identified other people who might have been involved, but he was unable to positively identify anyone else from photographic lineups. At trial, Delatorre testified Odell "more or less" looked like the person who approached him outside the store and asked, "'What's up, man?'" but he was not completely sure. Delatorre testified it was "possible" that he previously knew Odell, but he did not think it was likely.

N.G. testified he knew the members of the Muhammad family from the neighborhood but they were usually nice to him. N.G. testified it was difficult to see because it was dark, but a street light enabled him to see some things about the assault. He identified Raheem from a photographic lineup as the person who hit the victim but then said, "'Stop, that's enough.'" N.G. testified he was pretty sure of that identification. At trial, N.G. again identified Raheem as that person. N.G. did not identify Odell either through photographic lineups or at trial. N.G.'s mother testified there was sufficient light to see the victim but she was unable to identify any of the assailants.

Fresno Police Detective Brad Alcorn interviewed Delatorre a week after the assault. Delatorre stated he suffered a fractured skull, a ruptured ear drum, and lost a tooth. Delatorre stated he was assaulted by seven to eight people, their ages ranged from 10 to 18 years old, and they took over $500 in cash from him. Delatorre reviewed photographic lineups and identified Odell as the person who initially confronted him at the market and asked, "'What's up?'" Delatorre stated that Odell and the others punched and kicked him.

Detective Alcorn interviewed N.G. and his mother in February 2001. N.G. said eight African-Americans surrounded the victim, asked for a cigarette, and then beat him. N.G. looked at several photographic lineups, and identified S.M. and Raheem as being in the group that attacked Delatorre. N.G. said that Raheem participated in the assault but told the others to stop and that it was enough. He did not identify Odell. N.G. also identified Will Muhammad as someone he recognized, but he was not sure if he was involved in the assault.

Based on this incident, both Raheem and Odell were charged and convicted of count II, second degree robbery of Jose Delatorre, with the great bodily injury enhancement and the gang enhancement; and count III, assault by means of force likely to produce great bodily injury on Ricardo Hernandez, also with the gang enhancement.

**Robbery/Murder of Alejandro Escareno (Count I)**

Alejandro Escareno lived on East Jensen in Fresno with his adult son. Escareno was 69 years old and had lived in the neighborhood for 20 years. Escareno regularly used the city bus to get around town, and had a frequent rider pass. Escareno usually caught the 10:00 a.m. city bus, from the bus stop in front of the Jensen-Walnut Market, and went downtown to visit acquaintances. Escareno generally was in good health but his eyesight
was failing. Moreover, he was occasionally disoriented about the time of day, and sometimes got off at the wrong bus stop.

Escareno's son testified that his father knew there had been trouble at the local market and he tried to avoid confrontations. "He was ... very peaceful, timid, very meek." If someone asked him for money, he probably would give some cash if the

person needed it.  He often carried a substantial amount of cash because he did not want to deposit it at the bank.

Kenneth Marple drove the city bus through the neighborhood, and knew Escareno as a frequent passenger who boarded at the bus stop by the market and traveled downtown.  Around 4:42 p.m. on December 17, 2000, Marple was ahead of schedule as he arrived at the market.  He needed to wait for the correct arrival time in case there were any passengers, and decided to go into the market and buy a soda.  As he drove up to the bus stop, Marple saw Escareno walking up and down the sidewalk.  Escareno looked kind of confused and unsteady, and he repeatedly changed directions as he walked around.

Marple testified a young African-American teenager rode a bicycle around the bus.  He appeared around 11 to 14 years old.  He was followed on foot by two other teenagers: one was about 11 to 14 years old, and the other was about 17 to 18 years old.  As the three teenagers moved toward the bus, Escareno moved away from it; when the teenagers moved away from the bus, Escareno walked toward it.  Marple thought Escareno could not decide whether he wanted to get on the bus.

Marple went into the market, purchased a soda, and returned to the street.  Marple noticed the teenager on the bicycle was harassing other customers as they left the store.  Marple testified the teenager on the bicycle rode up to him and said, "'Give me your soda.'"  Marple replied there were plenty of sodas in the store and to get his own.  The teenager said, "'No, I want yours. I want yours.'"  Marple said no and headed for his bus.  The teenager kept riding around and harassing him.  The other teenagers were further away but they seemed in communication with each other.

Marple returned to the bus and closed the door.  The teenager on the bicycle knocked on the door and said he needed to take the bus.  Marple opened the door and the same teenager said, "'Psych, you fool. You shouldn't have opened the door.'"  Marple testified the teenager acted like a typical "obnoxious juvenile [ ]."  Marple replied that he thought he needed to take the bus.  The teenager said, "'No one here needs the bus.  Continue on.'"

Marple apparently took the teenager's advice and drove away from the bus stop.  As Marple left the area, he noticed Escareno was walking down Garrett Street.  Marple thought about pulling over to pick up Escareno, but it was against policy to stop and pick up someone on the street who was not at a bus stop.  Marple had just been hired as a bus driver that year, and he did not want to lose his job.  Marple drove on and did not see anything else. (footnote 4)

> Footnote 4.  Kenneth Marple reviewed numerous photographic lineups and stated that both C.A. and Odell "resembled" the teenager on the bicycle who rode around the bus and told him to leave.

Ricky Pierson was again sitting on the porch at Estelle Howard's house, across the street from the market, and observed the entire sequence which led to Escareno's death.  Pierson was visiting Ms. Howard's son, Leroy Howard.  They were joined by her other son, Anthony Pruitt, Sr.  Pierson admitted he used crack cocaine and drank beer earlier that day.

Pierson testified he saw an "old man" standing across the street at the bus stop.  He had seen this man at the bus stop on other occasions, and they occasionally took the same bus. Pierson later identified this person as Alejandro Escareno.

6

Pierson testified he observed three separate encounters between Escareno and a group of African-American assailants, which culminated in Escareno's death. The first encounter began as Escareno walked down the street and was approached by a group of teenagers from the Muhammad family. The Muhammads turned the corner from Garrett to Walnut and walked along with Escareno. Pierson thought Escareno was going to buy some drugs from them, but the teenagers "jump[ed]" him and began to beat and kick Escareno. Pierson testified the group consisted of Raheem, Odell (also known as "Yack"), F.K.M., S.M., M.M., C.A., Hakim, Kevin, and M.H. Pierson testified several younger members of the Muhammad family, from five to nine years old, were also in the group, and described them as "the new generation of the Muhammads." Pierson believed they emerged from the home of their grandmother, Evelyn Muhammad, on Garrett Street. There were about 11 people in the group.

Pierson testified all of the assailants were punching and kicking Escareno and he fell down. Pierson testified that after Escareno fell down, the assailants stopped hitting and kicking him, but instead went through his pockets. The younger children in the group did not join the assault but just watched. C.A. and M.M. also punched and kicked Escareno, and they were "going for his pockets, pulling for change. I mean, just whatever they was going for, they was going for it ... I heard change fall. They was at his pockets." They were "grabbing his jacket, pants, they was everywhere." Pierson heard C.A. say "'that guy came up.'" Pierson testified the phrase meant "basically like you got what you wanted.... Like, I mean, 'You livin' better when you came up,'" that they got what they were looking for.

Pierson testified the assailants left Escareno on the street and went back around the corner, down Garrett Street, toward a house. Escareno continued to lay on the street next to the curb, and it "seemed like he was out because he wasn't movin' at first." After a few minutes, Escareno seemed to regain consciousness. He stood up and "was kind of staggering like he wasn't all there." Pierson testified that "for some reason," however, Escareno walked toward the corner of Walnut and Garrett.

Pierson testified the second encounter began at that point, when "the same crowd" of Muhammads returned around the corner. Pierson testified the group included Raheem, Odell, F.K.M., M.H., S.M., C.A., M.M., and "a lot of little bitty kids." (footnote 5)

> Footnote 5. On redirect examination, Pierson testified he was not sure if Raheem was present during the second encounter.

The group again attacked Escareno, and they were kicking and hitting him. The younger children watched as the older children assaulted Escareno. The assailants told Escareno to "'Get up. Get up, go. Get away from here.'" They continued to punch and kick him as if they were trying to get him to move along, but they were not kicking him hard. Pierson testified Escareno stood up, and the assailants left the area and went back around the corner.

Pierson testified Escareno was wobbly and seemed like "a drunk person. He was trying to get his composure, I guess." "I don't know why he turned, went back down that corner again, but that's where he went," toward the corner of Garrett and Walnut. He was still unsteady and tried to maintain his balance as he walked. Escareno made it to the corner and looked down Garrett Street. Pierson believed the assailants were able to see him from that position: "I assumed that was the reason they came back because he stood right on the corner and he looked down [that] way."

7

Pierson testified the third encounter began when a "lot" of the same group, accompanied by the "little kids," ran down Garrett Street toward Escareno. "All of them came mostly, like, just about runnin' down the sidewalk, tellin' him to, 'Get on, leave.' Pushin' him, tellin' – leave." Raheem was part of this group.

Pierson was still on the porch with Pruitt when someone from the group shouted to them: "'Come get your friend.'" Pierson initially testified that person was Raheem, but he thought about it and changed his mind: "I said Raheem, but in my mind it was Yack [Odell], but I don't know why I said Raheem." Pierson testified that Estelle Howard, Pruitt's mother, was on the porch and responded that Pruitt did not know the man. Pierson admitted no one intervened to help Escareno or told the group to leave Escareno alone.

Pierson testified that at that moment, someone from the group resumed the assault and delivered a single punch to Escareno with a closed fist. Escareno "just fell," and "then he didn't move, that was it." "It happened so fast, it just-boom, hit him and he fell. And everybody just took off and left." Pierson testified the crowd ran back down the street, and probably returned to the grandmother's house.

Pierson testified this last group consisted of Raheem, Odell, S.M ., M.M., C.A., and F.K.M. There were other people in the group but Pierson could not recall their names. Pierson initially stated that S.M. threw the final punch, but subsequently said that H.M. threw the last blow. Pierson never said that Raheem threw the final punch.

Pierson admitted that the events were fresher in his mind when he was interviewed by the police, and he could not remember what he said to them. He might have been confused when he spoke to the police but he tried to tell the truth. Pierson remembered that he testified at the preliminary hearing, but he could not remember what he said. Pierson was impeached with his preliminary hearing testimony that Raheem only participated in the first assault on Escareno and was not present for the subsequent assaults, but that Odell was present for all the assaults.

Pierson testified that he was initially too scared to get involved in the case because his family lived in the neighborhood, but insisted he was telling the truth, his testimony was not intended to harm the Muhammad family, and it was not in retribution for his prior drug convictions.

There were several other witnesses who were present and observed various aspects of the robbery and murder. Anthony Pruitt, Sr. testified that he was at his mother's house with Ricky Pierson, and they used crack cocaine and drank alcohol that day. Pruitt testified he did not remember anything about the assault on Escareno. When he first saw Escareno walking down the street, he appeared unharmed. Pruitt went inside his house to use the bathroom. When he returned to the porch, he saw an old man laying on the street next to the curb.

Pruitt testified he was diagnosed with schizophrenia and had taken psychiatric medications for 31 years because he heard voices and saw shadows. The medications affected his ability to understand and remember. He gave a statement to the police at the time of the homicide, but he could not remember what he said. Pruitt admitted he was addicted to cocaine, he had prior convictions for selling or furnishing narcotics, and he was on parole for possession of cocaine.

Estelle Howard testified she was driving back to her house when she noticed "quite a few" Muhammads standing on the corner of Walnut and Garrett Streets. There were about eight to 10 people between the ages of 10 and 18 years. She did not know

their names but recognized their faces. She knew that some of the Muhammad children lived with their grandmother on Garrett Street. They were just standing there and no one was running away. At trial, Ms. Howard testified she recognized Odell and Raheem from the neighborhood, and also some of the Muhammad family members who were present in the courtroom during the instant case.

Ms. Howard parked at her house and Pruitt, her son, said that a man had been jumped, and asked her to call the police. Pruitt was excited and trying to tell her what happened. (footnote 6) Pruitt told Ms. Howard, "'Muhammad jumped on a man.'" Ms.

Footnote 6. Ms. Howard testified that Pruitt was on medication because "[h]e sees things I don't see" and he had difficulty perceiving things around him.

Howard saw a body laying in the street by the curb. She did not approach the body and no one was standing around it, but the Muhammad group seemed to be looking at the body. Ms. Howard immediately called 911 but she could not get through. Ms. Howard was still trying to call 911 when her family called out that the police had arrived in the neighborhood. Ms. Howard looked outside and saw the police were there.

Lionel Aponte lived in the area and was familiar with the Muhammad family, and did not have a good opinion of them. Aponte's brother had some dealings with the Muhammad family, and previously warned Aponte, "'Watch out for when they run in a group because they'll all – they'll all get you.'" Aponte had never been attacked by members of the Muhammad family, "but there is always opportunity." Aponte had prior misdemeanor convictions for domestic violence and assault in 1995. Aponte testified he did not want to be involved in this case.

Aponte testified he was walking toward the market when he stopped at the corner of Walnut and Garrett and saw eight to 12 African-American youths running around the corner, "kind of like they were in a snake, all following one person." Aponte testified they ran away from him down Walnut, turned on Garrett, and headed toward a house on Garrett where the Muhammads lived.

Aponte continued toward the market but stopped at Estelle Howard's house, where he saw Ricky Pierson and Leroy Howard. He asked Pierson what was going on. "... I wanted to see – make a decision in my direction if I was going to continue to go to the store and get trapped on the other side or return home, so at that point I – I decided to just wait – wait it out." An old man was sitting on the curb across the street. Pierson pointed toward the old man and said: "'Muhammads just got done beating up this bum.'" Pierson also said that some of the Muhammads did not live on Garrett Street but had gathered there. Pierson did not specify any individuals by name. Pierson might have said "that they robbed him or something of that sort, but I'm not actually 100 percent sure." Aponte testified Pierson "was a little emotional and everybody was upset that was there."

Aponte testified the man on the curb stood up and tried to walk away but staggered and stumbled. He was hunched over but able to walk, and seemed to head for the market. Aponte testified that he did not think the man needed help because he was standing up and walking around. Aponte knew the man had been attacked and conceded he "didn't seem to be okay, but he was moving and I wasn't going to cross the street to find out his condition, but he was moving. So, that was good enough for me."

Aponte testified that he knew Escareno very well but he did not realize the man in the street was Escareno because the man's head was down and in his hands, and his

back was turned as he walked away from Aponte.  Aponte insisted that he would have helped the man if he had realized he was Escareno.  "I wasn't considering helping that individual because I didn't know him.  That's number one.  Unless he was really down and hurt.  My consideration was for myself.  To make sure that I got out of the area because I already knew – what was going on."

> "Q:  If he had seemed to be seriously hurt, you would have come to his assistance, yes? [¶] ... [¶]

> "[A]:  It would depend. If I knew it was him, I would defended [sic] him. [¶] ... [¶] That's just the point. If I knew it was him. It was a different individual, then, that's a whole different thing. I would have to consider who, how many, what options do I have to defend that person...."

Aponte testified he did not go to the market or stay around the area. Instead, he walked back to his house and did not see anything else.

> Norwood McCoy was walking to the store when he saw a "hump" in the street. He approached and discovered the "hump" was a man, who was bleeding as if he had been hit by a car. McCoy knew the Muhammads, but he did not see any family members or anyone else on the street at that time.  McCoy stood next to the man until the police arrived.  (footnote 7)

> > Footnote 7.  As stated *ante*, McCoy had previously been attacked by a member of the Muhammad family.  At trial, McCoy admitted that he previously had a dispute with F.K.M. about repairing his car, and F.K.M. hit his head with a pipe.  Another member of the Muhammad family took McCoy to the hospital after that incident.  McCoy needed 16 to 17 stitches but never reported the assault.  Neither Raheem nor Odell were involved in the pipe incident.

(Lodgment ("LD") No. 11 at 10-24.)

## III.   PROCEDURAL BACKGROUND

On April 21, 2003, Raheem Muhammad was convicted in Fresno County Superior Court of one count of first degree felony murder of Alejandro Escareno, within the meaning of California Penal Code section 189, one count of second degree robbery of Jose Delatorre, within the meaning of Penal Code section 211, and one count of assault, within the meaning of Penal Code section 240.  (Rep's Tr., vol. 36 at 10508-10.)   The jury also found true a special circumstance allegation that the murder was committed while Muhammad was engaged in the commission or attempted commission of a robbery of Escareno, within the meaning of Penal Code section 190.2(a)(1)(A), that the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang, within the meaning of Penal Code section 186.22(b)(1), and that Muhammad knew or reasonably should have known that Escareno was sixty-five years or older, within the meaning of Penal Code section 667.9(a).  (*Id.*)

06cv0549

1   Finally, the jury found that the robbery of Delatorre and the assault were committed for the benefit of,

2   at the direction of, and in association with a criminal street gang, within the meaning of Penal Code

3   section 186.22(b)(1), and that Muhammad personally inflicted great body injury on Delatorre.  (*Id.*)  The

4   jury acquitted Muhammad of assault by means likely to produce great bodily injury.  (*Id.*)

5        Muhammad was sentenced to life without the possibility of parole for the murder.  (Rep's Tr.,

6   vol. 38 at 11136-37.)  This sentence was enhanced with a determinate term of eleven years for the

7   various enhancements.  (*Id.*)

8        Muhammad appealed his conviction to the California Court of Appeal for the Fifth Appellate

9   District.  (LD Nos. 2, 5, 7.)  That court affirmed the convictions but struck a two-year gang enhancement

10  as improperly imposed.  It then reinstated the gang enhancement at the proper ten-year amount and

11  directed the abstract of judgement to be corrected.  (LD No. 11.)

12       Muhammad filed a petition for review in the California Supreme Court.  (LD No. 12.)  That court

13  denied the petition.  (LD No. 14.)

14       Muhammad filed this federal habeas corpus petition in the United States District Court for the

15  Eastern District of California on May 8, 2006.  (*See* Doc. No. 1.)  Respondent filed an Answer and

16  Memorandum of Points and Authorities in Support of the Answer on April 17, 2008.  (*See* Doc. No. 8.)

17  The case was reassigned to United States District Judge Marilyn L. Huff of the United States District

18  Court, Southern District of California on November 25, 2008.  (*See* Doc. No. 12.)

19  **IV.**   **DISCUSSION**

20       **A.**   **Scope of Review**

21       Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

22  habeas corpus claims:

23       The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
         entertain an application for a writ of habeas corpus in behalf of a person in custody
24       pursuant to the judgment of a State court only on the ground that he is in custody in
         <u>violation of the Constitution or laws or treaties of the United States.</u>
25

26  28 U.S.C. § 2254(a) (2006) (emphasis added).  As amended, 28 U.S.C. § 2254(d) reads:

27       (d) An application for a writ of habeas corpus on behalf of a person in custody
         pursuant to the judgment of a State court shall not be granted with respect to any
28

claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (2006) (emphasis added).

"[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)).  Because Muhammad's claims were adjudicated on the merits in state court, to obtain federal habeas relief, Muhammad must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

### B.     Analysis

Muhammad raises a total of seven claims in his petition.  First, he argues that the jury instructions failed to properly inform the jury that in order to find the special circumstance of murder committed in the course of a robbery true they had to conclude that the murder was committed to

advance the robbery, facilitate escape or avoid detection and was not merely incidental to the murder. Second, Muhammad claims his special circumstance felony murder conviction violates his Eighth and Fourteenth Amendment rights because the jury instructions permitted the jury to use the factual finding needed to convict him of first degree felony murder to also find the special circumstance to be true. Third, he contends there was insufficient evidence to support the jury's finding of the special circumstance of murder in the commission of a robbery. (Pet'rs Attach. at A-C.)

Muhammad also seeks to join in any claims raised by his codefendant Odell Muhammad. Although according to Respondent, Odell Muhammad does not have any federal habeas corpus petitions pending, Respondent assumes for the purposes of this petition that Raheem Muhammad seeks to raise in this Court the four claims exhausted by Odell Muhammad in state court and with which he joined during the state appellate process. The Court accepts this analysis by Respondent. Those four additional claims will thus be considered part of Raheem Muhammad's petition. Claim four of the instant petition, therefore, argues that Raheem Muhammad's federal due process rights were violated by the admission of Odell Muhammad's involuntary statement. In claim five, Petitioner argues that the state court's denial of access to juror information in order to develop a motion for a new trial based on juror misconduct violated his federal due process rights. In claim six, Muhammad contends that the district attorney waived his right to seek a ten-year criminal street gang enhancement on appeal because the error in the defendants' sentences, which improperly imposed a two-year enhancement, was not discovered until the case was on appeal. Finally, in claim seven Muhammad argues that the imposition of consecutive sentences violates the Supreme Court's pronouncement in a series of cases, beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and culminating with *Cunningham v. California*, 549 U.S. ___ (2007), that any term of imprisonment which exceeds the statutory maximum must be based upon facts found by a jury beyond a reasonable doubt and not by a judge with a lesser burden of proof. (Pet'rs Attach. D; LD No. 13.)

Respondent counters that claim one is procedurally barred, and, in the alternative, is only partially exhausted. As to the exhausted portion of the claim, Respondent contends the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. As to claims two and three, Respondent also argues that the state court's denial of

1   those claims was neither contrary to, nor an unreasonable application of, clearly established Supreme

2   Court law.  With regard to claims four through seven, those raised by Odell Muhammad and joined by

3   Raheem Muhammad, Respondent contends the following: the challenge to the admission of Odell

4   Muhammad's statement is procedurally defaulted (claim four), the state court's denial of access to juror

5   information was neither contrary to, nor an unreasonable application of, clearly established Supreme

6   Court law (claim five), the district attorney's alleged waiver of right to ask for a ten-year gang

7   enhancement fails to state a federal constitutional question (claim six) and the state court's denial of the

8   claim that the facts upon which the consecutive sentencing was based were required to be found by a

9   jury beyond a reasonable doubt and not a judge with a lesser standard of proof is both barred by *Teague*

10  *v. Lane*, 489 U.S. 288 (1989) and is consistent with United States Supreme Court precedent (claim

11  seven).

12         1.      *Error in the Special Circumstance Jury Instructions (Claim One)*

13         Muhammad claims the jury was not properly instructed as to the robbery-murder special

14  circumstance allegation because the instruction did not adequately inform the jury that the murder must

15  have been committed in order to advance an independent felonious purpose and was not merely

16  incidental to the robbery.  (Pet'rs Attach. A.)  The instructions inadvertently told the jury if they found

17  the murder was committed while Muhammad was engaged in or was an accomplice in a robbery, "*or

18  and*" the murder was committed to carry out or advance the robbery, to facilitate escape or avoid

19  detection, they should find the special circumstance true.  According to Muhammad, the instruction

20  should have omitted the word "or" and used the word "and" only to join these two concepts.  Because

21  the instructions contained the words "or and" instead of simply "and," Muhammad argues, the jury

22  could have found the special circumstance to be true without making the required finding that the

23  murder was carried out to advance the robbery, facilitate escape or avoid detection.  This, he claims,

24  violated his Sixth Amendment right to have the jury determine every element of the offense and his

25  Fourteenth Amendment due process rights.  (Pet'r Attach. A; Attach. E at 12-21.)

26  / / /

27  / / /

28  / / /

06cv0549

a.    *Procedural Default*

Respondent first contends that this claim is procedurally defaulted.[1]  (Mem. of P. & A. Supp. Answer at 32-34.)  The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first have "adequately pled the existence of an independent and adequate state procedural ground . . . . "  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the defense at issue, Muhammad must then "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ."  *Id.*  The "ultimate burden" of proving procedural default, however, belongs to the state.  *Id.*  If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Muhammad can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Because the California Supreme Court denied this claim without citation of authority, this Court must "look through" to the underlying state appellate opinion as the basis for its analysis.  *See Ylst*, 501 U.S. at 801-06.  Respondent asserts the state appellate court imposed an adequate and independent state procedural bar when it found that Muhammad had waived any claim regarding the improper jury instruction because he had not raised the issue in the trial court.  (Mem. of P. & A. Supp. Answer at 32-34; Lodgment No. 11 at 90-91.)  Accordingly, Respondent has satisfied his initial burden under *Bennett*.  The burden now shifts to Muhammad to put the defense at issue.  *Bennett*, 322 F.3d at 586.  Muhammad has presented no argument, evidence or  ". . . specific factual allegations that demonstrate the inadequacy of the state procedure . . . ."  Accordingly, he has failed to meet his burden under *Bennett*.  The claim is procedurally defaulted and federal review of the claims is foreclosed unless Muhammad can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law,

_____

[1]  Respondent also contends that only the Eighth Amendment challenge to the instruction is exhausted because although the Sixth Amendment basis for his claim was raised in the petition for review filed in the Supreme Court, California Rule of Court 28(c)(2) stated at the time that the California Supreme Court "would consider only the facts and issues stated in the California Court of Appeal's Opinion."  (Mem. of P. & A. Supp. Answer at 34-35.)  However, a claim is considered to be exhausted "if it is clear that the claims are now procedurally barred under [state] law." *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Valerio v. Crawford*, 306 F.3d 742, 770 (9th Cir. 2002)(claim may be considered exhausted if it obviously procedurally barred).  Accordingly, contrary to Respondent's contention, the Sixth Amendment basis for Muhammad's claim is technically exhausted.  *See Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (stating that a claim is technically exhausted when a petitioner "demonstrates that no state remedy remains available.")

06cv0549

1    or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."

2    *Coleman*, 501 U.S. at 750.

3          b.    *Cause and Prejudice*

4          The cause prong is satisfied if Muhammad can demonstrate some "objective factor" that

5    precluded him from raising his claims in state court, such as interference by state officials or

6    constitutionally ineffective counsel. *McClesky v. Zant*, 499 U.S. 467, 493-94 (1991). Muhammad has

7    not provided the Court with any "objective factor" that precluded him from raising these claims in state

8    court. "Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the

9    alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). Muhammad has also failed to

10   establish prejudice because, as discussed below, his claim is meritless. *Coleman*, 501 U.S. at 750.

11         c.    *Merits*

12         In its opinion denying this claim, the state appellate court wrote an exhaustive discussion of

13   California law as it relates to the special circumstance allegation and the appropriate jury instructions

14   to be given in such cases. The relevant portion of that discussion is as follows:

15         We must begin with the general principles behind the robbery-murder special
     circumstance. As set forth *ante*, the robbery-murder special circumstance applies to a
16   murder in the commission of a robbery, not to a robbery committed in the course of a
     murder. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 41.) CALJIC No. 8.81.17 states the
17   elements for the felony-murder special circumstance. The first paragraph states that it
     must be proved the murder was committed while the defendant was engaged in or an
18   accomplice in the commission of the applicable felony. This language is identical to the
     statutory definition as set forth in section 190.2, subdivision (a)(17), that the murder was
19   committed "while the defendant was engaged in, or was an accomplice in, the
     commission of" the applicable felony.

20

21         The second paragraph of CALJIC No. 8.81.17 states the murder was committed
     in order to carry out or advance the commission of the crime of the applicable felony, or
22   to facilitate the escape therefrom or to avoid detection. It also states: "In other words,
     the special circumstance referred to in these instructions is not established if the
23   [applicable felony] was merely incidental to the commission of the murder." (CALJIC
     No. 8.81.17.)

24         This second paragraph derives from *People v. Green* (1980) 27 Cal.3d 1 (*Green*),
     where the California Supreme Court determined the felony-murder special circumstance
25   for murder "'during the commission of'" certain felonies required a finding that the
     accused "killed in cold blood in order to advance an independent felonious purpose."
26   (*Id.* at p. 61.) In *Green*, a jealous husband lured his 16-year-old wife to a remote area
     and
27   executed her. In the process, he ordered her at gunpoint to remove her clothes, which
     he placed in his vehicle and subsequently destroyed; such evidence thus satisfied the
     elements of robbery. (*Id.* at pp. 12-16, 57-59.)

28

*Green* upheld murder and robbery convictions, but reversed the robbery-murder special circumstance because the evidence showed "it was not in fact a murder in the commission of a robbery," as required by section 190.2, but rather "the exact opposite, a robbery in the commission of a murder." (*Green*, *supra*, 27 Cal.3d at p. 60.) This distinction was of constitutional dimension because "it would not rationally distinguish between murderers to hold that this defendant can be subjected to the death penalty because he took his victim's clothing for the purpose of burning it later to prevent identification, when another defendant who committed an identical first degree murder could not be subject to the death penalty if for the same purpose he burned the victim fully clothed – or even if he doused the clothed body with gasoline and burned it at scene instead.   To permit a jury to choose who will live and who will die on the basis of whether in the course of committing a first degree murder the defendant happens to engage in ancillary conduct that technically constitutes robbery or one of the other listed felonies would be to revive 'the risk of wholly arbitrary and capricious action' condemned by the high court plurality in *Gregg* [*v. Georgia*, *supra*, 428 U.S. at p. 1989].)   We conclude that regardless of chronology such a crime is not a murder committed 'during the commission' of a robbery within the meaning of the statute." (*Green*, *supra*, 27 Cal.3d 1, 61-62, fn. omitted.)

The standard jury instruction for the felony-murder special circumstance was subsequently modified to reflect *Green*'s holding.  As a result, the second paragraph was added to CALJIC No. 8.81.17.   (*People v. Horning* (2004) 34 Cal.4th 871, 907 (*Horning*).)

> ". . . As we have summarized the rule, 'to prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent felonious purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.'" (*Horning*, *supra*, 34 Cal.4th at p. 907, quoting *Mendoza*, *supra*, 24 Cal.4th at p. 182.)

The California Supreme Court, however subsequently rejected the "suggestion that *Green*'s clarification of the scope of felony-murder special circumstances has somehow become an 'element' of such special circumstances, on which the jury must be instructed in all cases regardless of whether the evidence supports such an instruction." (*People v. Kimble* (1988) 44 Cal.3d 480, 501 (*Kimble*).)   "*Green* simply made clear that a robbery, in a special circumstance allegation, cannot be 'merely incidental to the murder.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 114 (*Valdez*).)  The second paragraph of CALJIC No. 8.81.17 is thus "not an element of the special circumstance allegation on which the jury must be instructed in all cases.  (*Valdez*, *supra*, at p. 114, fn 14.)

> ". . .The point we made in [*Green*], is that if the felony was merely incidental to the murder — as the evidence showed it was in *Green* — no separate felony-based special circumstance exists.   We have used various phrasings in explaining this requirement, two of which are included in CALJIC No. 8.81.17, but we have never suggested that we had created two separate requirements, or that any precise language was required to explain the concept to the jury." (*Horning*, *supra*, 34 Cal.4th at pp. 907-908.)

"Concurrent intent to kill and to commit an independent felony will support a felon-murder special circumstance.  [Citation.]  It is when the underlying felony is merely incidental to a murder that we apply the rule of *Green* . . . ." (*Raley*, *supra*, 2 Cal.4th at 870, 903.)

(LD No. 11 at 77-80.)

17

1    The California appellate court stated that "[t]here are a series of cases in which the California

2    Supreme Court has found that the partial or complete omission of the second paragraph of CALJIC No.

3    8.81.17 constitutes harmless error within the meaning of *Chapman v. California* (1967) 386 U.S. 18,"

4    and discussed seven such cases. (*Id.* at 80.)  The court then applied the principles of those cases to

5    Muhammad's claim:

6    　　As a preliminary matter, it could be argued the trial court's misstatement did not amount to an instructional error.  The trial court read the entirety of th first paragraph

7    with the transition "or and" leading into the entirety of the second paragraph.  It could be argued that the secondary placement of "and" essentially declined or nullified the

8    initial placement of "or," as if the court was correcting itself, i.e., that it mistakenly said "or" but then corrected itself by immediately saying "and."  It could also be argued that

9    "and," as the final word in the phrase, clearly linked the first paragraph to the second paragraph, so that the jury would have realized that the instruction consisted of both

10   paragraphs.  While the printed instruction, presumably given to the jury, contained "[or] [and]" within brackets as the linkage words, it could have resulted in some confusion as

11   to which word applied but the jury never asked any questions or requested further instruction on this issue.  In contrast to the cases discussed *ante*, the jury herein received

12   the complete text of the second paragraph, which was preceded by "and," and there is no evidence the jury was confused by the mistaken inclusion of "or" preceding "and."

13   (See, e.g., *Raley*, *supra*, 2 Cal.4th at pp. 903-904.)

14   　　　　. . . .

15   　　We also note that as in *Horning*, the jury herein heard the portion of the instruction that stated: "*In other words*, a special circumstance referred to in these

16   instructions is not established if the robbery was merely incidental to the commission of the murder."  (Italics added.)  While this sentence was included within the text of the

17   second paragraph, the very nature of the introductory phrase—"[i]n other words"—clearly indicated that the sentence addressed the entirety of the special

18   circumstance instructions given to the jury.

19   　　But also as in *Valdez*, appellant's claim fails on the merits.  If we are to presume that the presence of "or" in that phrase essentially nullified "and," then it effectively

20   amounted to giving the paragraphs in the alternative or the omission of the second paragraph.  (*Prieto*, *supra*, 30 Cal.4th at pp. 256-257.)  As in the cases discussed *ante*,

21   however, we find that the second paragraph of CALJIC No. 8.81.17 was not required to be given in this case.  *Navarrete* explained that the second paragraph was appropriate

22   only where "the evidence suggests the defendant may have intended to murder his victim without having an independent intent to commit the felony that forms the basis of the

23   special circumstance allegation."  (*Navarrete*, *supra*, 30 Cal.4th at p. 505.)  As in *Navarrete*, the record includes no significance [sic] evidence of any motive for

24   Escareno's murder other than robbery.  (*Ibid.*)  The entirety of the record herein reflects the primary purpose of the assailants on December 17, 2000, was to rob Escareno.  As

25   in *Harden*, the assailants herein demonstrated conduct that was virtually identical to an earlier robbery and assault.  (See, e.g., *Harden*, *supra*, 110 Cal.App.4th at pp. 863-864.)

26

27   Just one week earlier, Delatorre was jumped at the market by Raheem, Odell, C.A. and other members of the Muhammad gang.  Delatorre was beaten and knocked to the

28   ground, and his wallet was immediately removed.  Delatorre and Hernandez were repeatedly beaten until the assailants made their escape.  Indeed, both men were relieved to escape with their lives.  Escareno was the victim of the same type of scenario but not so lucky.  He was apparently confused about the time of day and trying to catch the bus,

18

06cv0549

and Raheem, Odell, C.A. and many of the same gang members took advantage of his confusion to jump him.  They beat and kicked him until he fell down.  They immediately went through his pockets in search of cash, and were apparently pleased with the recovery of his spare change.  As with Delatorre and Hernandez, the assailants resumed their savage beating of Escareno each time he tried to leave the area.  As the pathologist explained, it was impossible to determine which assault caused Escareno's death given the extremely limited time frame in which the assaults occurred.  The fatal brain injuries and hemorrhaging could have been caused by the first assault, the second assault, the final punch or as the cumulative result of the entire sequence of vicious attacks.  The murder herein was clearly incidental to the primary goal of robbing Escareno of whatever cash they could find and preventing his escape, and there is essentially no evidence the robbery was merely incidental to the murder.

Raheem points to the vicious nature of the repeated assaults and argues such evidence indicates the robbery may have been incidental to the murder.  As in *Navarette*, however, the bare brutality of the homicide is insufficient, by itself, to indicate that the robbery was committed in the course of the murder.  (*Navarette*, *supra*, 30 Cal.4th at p. 505.)  While the assailants twice resumed the vicious assaults after they had accomplished the robbery, such conduct may be indicative of the concurrent intent to kill and to commit the independent felony, rather than the independent felony being the primary goal and merely incidental to the murder.  Such a concurrent intent is supportive of the felony-murder special circumstance, and does not fun afoul of *Green*.  (*Raley*, *supra*, 2 Cal.4th at p. 903; *Monterroso*, *supra*, 34 Cal.4th at pp. 766-767.)

We also find the same reasons support the alternate argument that even if some evidence supported the second paragraph of CALJIC No. 8.81.17, the failure to unmistakably link the instruction's two paragraphs with "and" is again harmless.  As explained in *Harden*, the evidence overwhelmingly suggests the assailants committed the murder to advance the robbery.  Escareno was jumped, kicked, and beaten; as soon as he fell down, the assailants went through his pockets, almost in a frenzy, and were satisfied with their recovery of spare change.  The assaults resumed each time Escareno tried to walk away, but the brutality of the subsequent assaults is consistent with the concurrent intent to kill and commit the underlying felony, and still supports the robbery-murder special circumstance.

(LD No. 11 at 89-92.)

"Instructional error will not support a petition for federal writ of habeas relief unless it is shown 'not merely that the instruction is undesirable, erroneous, or even "universally condemned,"' [citation omitted], but that 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *see also Hedgpeth v. Pulido*, 129 S.Ct. 530, 532 (2008) (holding that where a jury is instructed on two theories of guilt, one of which is valid and the other invalid, a reviewing court must apply the harmless error analysis of *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Moreover, the allegedly erroneous jury instruction cannot be judged in isolation.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

06cv0549

1    Rather, it must be considered in the context of the entire trial record and the instructions as a whole.

2    *Id.*

3         Given the state court's analysis of this claim, it appears that under California law the second

4    paragraph of CALJIC No. 8.81.17 was not required to be given in any event because there was no

5    significant evidence to support a conclusion that the robbery was merely incidental to the murder.  *See*

6    *People v. Navarette*, 30 Cal.4th 458, 505 (2003); *see also Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir.

7    1993) (federal courts are "bound by a state court's construction of its own penal statutes").  Rather, as

8    the state court pointed out, prosecution witnesses testified that as soon as Escareno was beaten to the

9    ground, the group of assailants began going through his pockets.  (Rep's Tr., vol. 18 at 5155-56

10   (testimony of Ricky Pierson); vol. 21 at 6105, 6114 (testimony of Enrique Mendizabal); Supp. Clerk's

11   Tr., vol. 1 at 223, 249 (pretrial statements of Pierson and Anthony Pruitt).)

12        Even assuming the second paragraph of CALJIC No. 8.81.17 was required to be given under

13   California law, however, the state court's analysis of this claim was entirely consistent with the

14   requirements of *Estelle* and *Pulido*.  Considering the instructions as a whole, as required by *Estelle*, the

15   state court properly found that the inclusion of the word "or" together with the correct conjunctive word

16   "and" was harmless because the erroneous portion of the instruction was immediately followed by a

17   clarification which restated the conditions which had to be present in order for the jury to find the

18   special circumstance to be true, i.e., that the special circumstance could not be found true if the robbery

19   was "merely incidental to the commission of the murder."  (Rep's Tr., vol. 30 at 8776-77.)  The state

20   court also correctly noted that the evidence overwhelmingly established that the murder was committed

21   during the course of a robbery.  Ricky Pierson testified he saw two of the individuals who attacked

22   Escareno going through Escareno's pockets and heard change fall out.  (Rep's Tr., vol. 18 at 5155-56.)

23   Jerry Haroldsen, who interviewed Pierson as a witness before trial, testified Pierson told him that he

24   heard one of the attackers ask, "How much you got," and saw Muhammad searching Escareno's pockets

25   while he lay on the ground.  (Rep's Tr., vol. 21 at 6105, 6114.)  Enrique Mendizabal, a paramedic who

26   responded to the 911 call regarding Escareno, testified that Escareno's right pants pocket was turned

27   inside out and there was some change inside his jacket and on the ground around him.  (*Id.* at 6140-41,

28   6152.)  He also testified that as they attended to him, Escareno appeared to try to move his hand in and

out of his pocket.  (*Id.*)  In both Anthony Pruitt's and Pierson's pretrial statements, which were admitted at trial, Pruitt and Pierson stated that the individuals who attacked Escareno went through his pockets as he lay on the ground.  (Supp. Clerk's Tr., vol. 1 at 223, 249.)  In addition, the jury could have considered the assault and robbery of Delatorre about a week earlier, which was conducted in a nearly identical manner to the assault on Escareno, as evidence of a common scheme or plan which made robbery as the motive for the attack on Escareno much more likely.

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Muhammad is not entitled to relief as to this claim.

2.    *Dual Use of Facts to Support Felony Robbery-Murder and Special Circumstance (Claim Two)*

Muhammad  was found guilty of the felony first degree murder of Escareno within the meaning of California Penal Code section 189, and with the special circumstance that the murder was committed while Muhammad was engaged in the commission or attempted commission of a robbery within the meaning of California Penal Code section 190.2(a)(17)(A).  (*See* LD No. 1, Clerk's Tr., vol. 8 at 2229.)  Muhammad argues that the jury instructions improperly permitted the jury to use the same facts to both convict him of first degree felony murder (murder in the course of a robbery) and find true the special circumstance (robbery), in violation of his Eighth and Fourteenth Amendment rights.  Citing both United States Supreme Court and California cases, the state court analyzed this claim as follows:

> Raheem's argument is based on the following constitutional backdrop to the special circumstance law.    To comply with the Eighth Amendment, a state's capital punishment scheme must "afford some objective basis for distinguishing a case in which the death penalty has been imposed from the many cases in which it has not." (*People v. Crittenden* (1994) 9 Cal.4th 83, 154 (*Crittenden*); *People v. Bacigalupo* (1993) 6 Cal.4th 457, 465 (*Bacigalupo*); see also *Godfrey v. Georgia* (1980) 446 U.S. 420, 433.) "A legislative definition lacking 'some narrowing principle' to limit the class of persons eligible for the death penalty and having no objective basis for appellate review is deemed to be impermissibly vague under the Eighth Amendment. [Citations.]" (*Bacigalupo*, *supra*, 6 Cal.4th at p. 465.)

> Therefore, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (*Zant v. Stephens* (1983) 462 U.S. 862, 877; *Lowenfield v. Phelps* (1988) 484 U.S. 231, 244 (*Lowenfield*).)  The same rule applies to the sentence of life imprisonment without parole (LWOP) based on the special circumstance law.  (*People v. Estrada* (1995) 11 Cal.4th 568, 575-576.)

06cv0549

The narrowing function which limits the sentence of death or LWOP [life without the possibility of parole] to a small subclass of murderers is provided in California by the special circumstances contained in [California Penal Code] section 190.2 subdivision (a).  (*Crittenden, supra*, 9 Cal.4th at pp. 154-155.; *Bacigalupo, supra*, 6 Cal.4th at p. 467.)  As explained in section II, *ante*, the applicable special circumstance here is the robbery-murder special circumstance of section 190.2, subdivision (a)(17).

Raheem claims that use of the same felony-murder facts to establish both first degree murder and the robbery-murder special circumstance resulted in a denial of the constitutionally-required narrowing of the class of death- or LWOP-eligible murderers in violation of the Eighth and Fourteenth Amendments.  The California Supreme Court, however, has "consistently rejected the claim that the statutory special circumstances, including the felony-murder special circumstance, do not adequately narrow the class of persons subject to the death penalty [or LWOP]. [Citations.]" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195; *People v. Viera* (2005) 35 Cal.4th 264, 293.)

. . . .

In *People v. Marshall* (1990) 50 Cal.3d 907 (*Marshall*), the court again addressed and rejected the identical constitutional arguments against the felony-murder special circumstance.  In doing so, the court relied on the United States Supreme Court's holding in *Lowenfield*:

> "Defendant next claims the [special circumstances] law is violative of principles established in the double jeopardy clause of the Fifth Amendment, the cruel and unusual punishments clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment because it allows the 'triple use' of the same facts – i.e., to support (1) the conviction of first degree murder on a theory of felony murder, (2) the finding of the felony-murder special circumstances, and (3) the penalty of death.  But as defendant himself recognizes, the underpinnings of his argument have been removed by such decisions as *People v. Gates* (1987) 43 Cal.3d 1168, 1188-1190, and *People v. Anderson, supra*, 43 Cal.3d at page 1147.  Indeed, in *Lowenfield v. Phelps* (1988) 484 U.S. 231, 241-246, the United States Supreme Court made it plain that the 'triple use' of the same facts did not offend the cruel and unusual punishments clause.

> "Defendant's main complaint appears to be that the felony-murder special circumstance does not provide the 'meaningful basis [required by the Eighth Amendment] for distinguishing the few cases in which [the death
> penalty] is imposed from the many cases in which it is not.' (*Furman v, Georgia* (1972) 408 U.S. 238, 313 (conc. opn. of White, J.).)  But in *People v. Anderson, supra*, 43 Cal.3d at page 1147, we squarely rejected that very point.
> . . . .

[T]he California Supreme Court has repeatedly relied on *Lowenfield* and authorized "use of a felony to qualify a defendant both for first degree murder and for a special circumstance . . . ." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1183; see also *People v. Garrison* (1989) 47 Cal.3d 746, 793; *People v. Wader* (1993) 5 Cal.4th 610, 669; *People v. Ochoa* (1998) 19 Cal.4th 353, 479; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137; *People v. Sapp, supra*, 31 Cal.4th at pp. 286-287; *People v. Combs, supra* 34 Cal.4th at p. 868; *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164-168.)

Raheem acknowledges, as he must, the California Supreme Court has repeatedly rejected his constitutional attack upon the felony-murder special circumstance, but he asserts the court has done so based upon an erroneous interpretation of *Lowenfield*. The California Supreme Court, however, has continued to rely on *Lowenfield* and rejected similar attacks upon the felony-murder special circumstance. (See, e.g., *People v. Viera supra*, 35 Cal.4th at p. 293; *People v. Wilson* (2005) 36 Cal.4th 309, 361-362.)  Raheem also acknowledges this court is bound to follow the California Supreme Court's rulings on this issue (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), but raises this argument to preserve it for later review.  We thus reject Raheem's arguments but duly note the issue has been raised and preserved.

(LD No. 11 at 67-71.)

As the state court properly noted, "[i]t is a constitutional requirement of capital sentencing schemes that they 'perform a narrowing function with respect to the class of persons eligible for the death penalty." *Edwards v. Ayers*, 542 F.3d 759, 766 (9th Cir. 2008) citing *Jones v. United States*, 527 U.S. 373, 381, (1999).  In California, robbery can be used to elevate the seriousness of a murder in two ways.  First, a jury may conclude a defendant is guilty of first-degree felony murder because the murder was committed "in the perpetration of, or attempt to perpetrate, . . . robbery . . . ." (Cal. Penal Code § 189.)  "The felony-murder rule broadens criminal liability, imposing a kind of vicarious liability for murders that occur during the commission of a felony.  Felony murder, without more [however], does not make a defendant eligible for the death penalty." *Clark v. Brown*, 450 F.3d 898, 914 (2006).  Once a jury has found a defendant guilty of first-degree felony robbery-murder, they may also find true the special circumstance that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing or attempting to commit . . .[r]obbery. . . ." *See* Cal. Penal Code § 190.2(a)(17)(A).  A special circumstance finding makes a defendant eligible for a sentence of either life without the possibility of parole or death.  *See* Cal. Penal Code § 190.2(a).  As the Ninth Circuit has noted:

The felony-murder special circumstance statute . . . narrows criminal liability, allowing capital punishment only for a certain restricted class of murders.  Under the felony-murder special circumstance statute . . . a defendant is not death-eligible for ordinary felony murder.  Rather, he is death-eligible only if the murder advances an independent felonious purpose, such as the murder of a witness in order to avoid identification.

*Clark*, 450 F.3d at 914.

Thus, in California, the constitutionally required narrowing function occurs when the jury must decide whether a special circumstance allegation is true.  Muhammad contends, however, that the dual use of the robbery to both elevate the homicide to felony murder and elevate the felony murder to a special circumstance felony murder, divests California's narrowing scheme of meaning.  As the state court noted, the Supreme Court's opinion in *Lowenfield* appears to reject this contention.  In *Lowenfield*, the defendant challenged Louisiana's capital sentencing scheme on the ground that it did not properly narrow the class of murderers to which capital punishment could be applied because it permitted a jury to use the same fact to both find an element of the crime and to find an aggravating circumstance sufficient to impose the death penalty.  *Lowenfield*, 484 U.S. at 241.  Because this required the jury to simply repeat their guilt findings, Lowenfield argued the statute did not narrow the class of persons eligible for the death penalty.  The Court disagreed, stating as follows:

> [T]he narrowing function required of a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. [Citations omitted.] . . . .  Here, "the narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person."  The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentenced constitutionally infirm.

*Lowenfield*, 484 U.S. at 246.

While California's statutory narrowing scheme is not precisely the same as Louisiana's of which the Court approved in *Lowenfield*, the *Lowenfield* Court clearly concluded that the dual use of facts in the manner employed in Muhammad's case was not unconstitutional.  Accordingly, the state court's denial of this claim, based on its interpretation of *Lowenfield* was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See Williams*, 529 U.S. at 412-13.  Muhammad is not entitled to relief as to this claim.

     3.    *Sufficiency of the Evidence to Support the Special Circumstance Finding (Claim Three)*

Muhammad claims there was insufficient evidence presented to support the jury's conclusion that the special circumstance allegation of murder committed during the course of a robbery was true.

1  (Pet'rs Attach. C.)  Respondent contends the state court's rejection of this claim was neither contrary

2  to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp.

3  Answer at 40-43.)  The California Supreme Court rejected this claim without citation of authority, and

4  thus this court must "look through" to the state appellate court's opinion as the basis for its analysis.

5  *Ylst*, 501 U.S. at 801-06.  Applying the California standard for review of sufficiency of the evidence

6  claims, which is identical to the United States Supreme Court's standard, that court wrote:

> The robbery-murder special circumstance applies to a murder in the commission
> of a robbery, not to a robbery committed in the course of a murder.  (*People v. Marshall*
> (1997) 15 Cal.4th 1, 41.)  For purpose[s] of the robbery special circumstance, a murder
> "'is not committed *during* a robbery within the meaning of the statue unless the accused
> has "killed . . . *in order to advance an independent felonious purpose, . . .*" [Citation.]
> A special circumstance allegation of murder committed during a robbery has not been
> established where the accused's primary criminal goal "is not to steal but to kill and the
> robbery is merely incidental to the murder . . . ."' [Citations.]" (*People v. Morris* (1988)
> 46 Cal.3d 1, 21, quoting *People v. Thompson* (1980) 27 Cal.3d 303, 322, italics in
> original.)  "Concurrent intent to kill and to commit an independent felony will support
> a felony murder special circumstance."  (*Raley*, *supra*, 2 Cal.4th at p. 903.)  It is only
> when the underlying felony is merely incidental to the murder that the felony-murder
> special circumstance does not apply.  (*Ibid*; *People v. Bolden* (2002) 29 Cal.4th 515, 554
> (*Bolden*).)  The independent purpose requirement thus distinguishes a felony-murder
> special circumstance from a simply felony murder, which only requires a showing that
> the defendant killed the victim during the course of the underlying felony.  (*People v.
> Bonin* (1989) 47 Cal.3d 808, 850.)

> Raheem points to the undisputed evidence that Escareno was still in possession
> of his wallet and a substantial amount of cash when he was found by the police and the
> paramedics, and asserts it is mere speculation to find that the murder occurred during the
> commission of a robbery.  The record disputes this claim.  Ricky Pierson extensively
> testified as to the sequence of assaults upon Escareno.  Pierson testified the entire
> incident began when members of the Muhammad family, including Raheem and Odell,
> jumped Escareno.  They brutally punched and kicked him until he fell down.  Once
> Escareno was on the ground, the assailants were "going for his pockets, pulling for
> change.  I mean, just whatever they was going for, they was going for it . . .I heard
> change fall.  They was at his pockets."  They were "grabbing his jacket, pants, they was
> everywhere."  C.A. subsequently admitted that he and Odell took change from the
> victim.  C.A. also admitted he used the changed to buy a soda at the market, but added
> the gratuitous claim that the victim reached into his own pockets during the assault, the
> change fell on the street, and C.A. just picked it up.  Raheem also admitted the younger
> kids went through the victim's pockets during the assault but claimed he told the kids to
> leave the victim alone.  Even Odell admitted that once the victim was knocked to the
> ground, C.A. went through his pockets and C.A. gave some change to him.

> Raheem correctly states that Escareno was still in possession of his wallet, which
> was in his front pocket and contained $407, and there was $120 in his right front pants
> pocket.  Raheem posits that since the assailants obtained an undetermined but
> presumably small amount of change, it is speculative to conclude the murder was
> committed during a robbery.  However, "[r]obbery is defined as the taking of person
> property of some value, *however slight*, from a person or the person's immediate
> presence by means of force or fear, with the intent to permanently deprive the person of

the property." (*People v. Marshall*, *supra*, 15 Cal.4th at p.34, italics added.)  The assailants never unbuttoned the victim's overcoat and had no way of knowing about the substantial amount of cash still in his possession.  But despite this oversight, the assailants apparently believed their robbery had been fruitful.  Pierson testified that as they went through the victim's pockets and pulled out the change, he heard C.A. say "'that guy came up.'"  Pierson explained the phrase meant "basically like you got what you wanted . . . .Like, I mean, 'You livin' better when you came up,'" that they got what they were looking for.  Indeed, C.A. admitted he used his share of the robbery proceeds to purchase a soda at the market that day.  The small amount of change apparently represented quite a windfall for the youthful assailants, and they believed their robbery had been successful.

The entirety of the record also supports the conclusion that the murder occurred in the course of a robbery, based on the other activities of members of the Muhammad gang.  Both Raheem and Odell were among the members of the Muhammad family who participated in the robbery and assault on Jose Delatorre at the market.  They surrounded Delatorre, punched and kicked him until he fell down, and immediately went through his pockets until they discovered his wallet.  They apparently removed the cash from the wallet but continued to beat Delatorre as he tried to return to his car, and assaulted Hernandez when he tried to help Delatorre.  Hernandez thought the assailants were going to kill Delatorre, and Delatorre thought it was a miracle he escaped with his life.

The robbery and assault upon Escareno was nearly identical to this earlier incident.  A trio of Muhammads, possibly including C.A., had already attempted to mug the bus driver when they confronted him and demanded his soda.  While the bus driver was not robbed or injured, he clearly acceded to their menacing demands to leave without waiting for Escareno.  The bus driver was told that no one wanted to take the bus and he should just get out of there.  The bus driver noticed Escareno appeared confused and frightened of the trio but, sadly, he was too worried about losing his job to pick up Escareno beyond the point of the actual bus stop.  Odell, Raheem, C.A., and the other Muhammad gang members robbed and assaulted Escareno in much the same manner as with Delatorre.  They jumped him, repeatedly punched and kicked him until he fell down, and immediately went through his pockets to accomplish the robbery.  Also as with Delatorre, the assailants continued to punch and kick Escareno each time he tried to walk away from the area.

There was no evidence "suggesting, or requiring the jury to conclude, that defendant took [the victim's] property merely to obtain a reminder or token of the incident [citation], to give a false impression about his actual motive for the murder, or in some other way to facilitate or conceal the killing [citation].  Nor was there substantial evidence of any motive for the murder apart from accomplishing the robbery." (*Bolden*, *supra*, 29 Cal.4th at p. 554.)  The evidence thus points to an intent to rob that degenerated into a killing, and the robbery-murder special circumstance is supported by substantial evidence.  (See, e.g., *People v. Williams*, *supra*, 30 Cal.App.4th at p. 1763.)

(LD No. 11 at 64-67.)

In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'*"

/ / / /

06cv0549

1   *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

2   (1979)).  In determining whether sufficient evidence has been presented, the Court must accept the

3   elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324 n.16.

4         As the state court discussed, there was more than sufficient evidence to support the jury's

5   conclusion that the Escareno's murder occurred during the commission of a robbery.  As this Court has

6   previously noted, Ricky Pierson testified he saw two of the individuals who attacked Escareno going

7   through Escareno's pockets and heard change fall out.  (Rep's Tr., vol. 18 at 5155-56.)  Detective

8   Haroldsen testified Pierson told him that he heard one of the attackers ask, "How much you got," and

9   saw Muhammads searching Escareno's pockets while he lay on the ground.  (Rep's Tr., vol. 21 at 6105,

10   6114.)  Paramedic Mendizabal testified that Escareno's right pants pocket was turned inside out and

11   there was some change inside his jacket and on the ground around him.  (*Id.* at 6140-41, 6152.)  He also

12   testified that as they attended to him, Escareno appeared to try to move his hand in and out of his pocket.

13   (*Id.*)  In both Anthony Pruitt's and Pierson's pretrial statements, which were admitted at trial, Pruitt and

14   Pierson stated that the individuals who attacked Escareno went through his pockets as he lay on the

15   ground.  (Supp. Clerk's Tr., vol. 1 at 223, 249.)  In addition, the jury could have considered the assault

16   and robbery of Delatorre about a week earlier, which was conducted in nearly an identical fashion as

17   the assault on Escareno, as evidence of a common scheme or plan which made robbery as the motive

18   for the attack on Escareno much more likely.

19         Muhammad argues that the prosecution's gang expert testified that robbery may not have been

20   a motive for the attack, because either a robbery or an assault would serve the Muhammad gang's

21   purpose of control, intimidation and the instilling of respect.  (Pet'rs Attach. C.)  It is true that the

22   prosecution's gang expert, Marcus Gray, testified that there was no difference in his mind between an

23   assault and a robbery as a tool for the gang to use in order to intimidate and control individuals and

24   instill respect for the gang.  (Rep's Tr., vol. 25 at 7239-40.)  It was within the province of the jury's fact

25   finding role, however, to believe the gang expert's testimony that gangs in general, and the Muhammads

26   in particular, use both robberies and assaults to accomplish their goals, but that in this instance Escareno

27   was attacked for the purpose of robbing him.

28   / / / /

Contrary to Muhammad's argument, the fact that there were alternative interpretations of the evidence does not mean there was insufficient evidence to support the verdict. In their role as "fact finders," the jury is entitled to credit some witnesses over others in arriving at their verdict. Here, the jury apparently believed Ricky Pierson's and Anthony Pruitt's version of the events, despite the thorough cross-examination engaged in by the defense and the many fruitful avenues of impeachment the defense employed. As discussed above, their testimony provided ample support for the jury's conclusion.

For all the foregoing reasons, the state court' denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

### 4.    *Admission of Odell Muhammad's Statement (Claim Four)*

As previously noted, in claims four through seven, petitioner Raheem Muhammad states he joins in any claims raised by his codefendant Odell Muhammad. Raheem Muhammad made the same request in his petition for review filed in the California Supreme Court. (Pet'rs Attach. D.) Respondent and the Court construe this as raising the same claims as Odell Muhammad raised in his petition for review, the first of which is a challenge to the admissibility of Odell Muhammad's statements. (LD No. 13 at 7-15.)

### a.    *Procedural Default*

Respondent contends that, as to Raheem Muhammad, this claim is procedurally defaulted because the state court imposed an independent and adequate state procedural bar to the claim. (Mem. of P. & A. Supp. Answer at 44-45.) The California Supreme Court rejected this claim without citation of authority. This Court must therefore "look through" to the state appellate court opinion as the basis for its analysis. *Ylst*, 501 U.S. at 801-06. That court wrote:

> On appeal, Raheem has not challenged the admissibility of his own pretrial statements, but instead argues that the admission of Odell's statements violated his own due process rights. A defendant who fails to raise an argument below in support of a motion under *Miranda* waives the argument on appeal. (*Lewis*, *supra*, 26 Cal.4th at p. 385; *People v. Raley*, (1992) 2 Cal.4th 870, 892 (*Raley*).) "Notions of fairness and practicality require that the prosecution be given an opportunity to argue [an] issue during trial. Without such objection, the parties could not develop the issue or further examine witnesses." (*Lewis*, *supra*, at p. 385; see also *People v. Holt* (1997) 15 Cal.4th 619, 665-667; *People v. Hill* (1992) 3 Cal.4th 959, 982, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn 13.) While we have already concluded

Odell's statements were properly admitted, Raheem would have been foreclosed from raising any issues regarding Odell's statements.

(LD No. 11 at 62-63.)

As previously discussed, in order to establish a claim is procedurally defaulted, Respondent must first have "adequately pled the existence of an independent and adequate state procedural ground . . . ." *Bennett*, 322 F.3d at 586. The state has met its initial burden under *Bennett*. In order to avoid procedural default of the claim, Muhammad must "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Id.* He has not done so. Accordingly, federal review of the claim is foreclosed unless Muhammad can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

b.   *Cause and Prejudice*

The cause prong is satisfied if Muhammad can demonstrate some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky*, 499 U.S. at 493-94. Muhammad has not provided the Court with any "objective factor" that precluded him from raising these claims in state court. "Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error." *Vickers*, 144 F.3d at 617. Muhammad has also failed to establish prejudice because, as discussed below, his claims are meritless. *Coleman*, 501 U.S. at 750.

c.   *Merits*

Raheem Muhammad's claim with regard to the admission of Odell Muhammad's statement is that Raheem's federal due process rights were violated if Odell's statements were involuntary but were nevertheless admitted at trial. (*See* LD No. 2 at 42.) "In general [a defendant] does not have standing to challenge a violation of [a third party's] rights; however, illegally obtained confessions may be less reliable than voluntary ones, and thus using a coerced confession at another's trial can violate due process." *Douglas v. Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003). However, "'[t]he prejudicial impact of any constitutional error is assessed by asking whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 [citations omitted] (1946)).

1   In his statement, which was admitted at trial, Odell Muhammad at first denied any involvement

2   in the assault on Escareno. (Supp. Clerk's Tr., vol. 2 at 326-27, 333, 337.) He claimed he saw Escareno

3   walking down the street but continued to play football. (*Id.* at 327-29.) He stated he later walked down

4   the street and saw Escareno lying on the ground. (*Id.* at 329.) He then saw Little Dean go through

5   Escareno's pockets and asked him for some money; Raheem was present in the area at some point. (*Id.*

6   at 334-35.) Near the end of the interview, Odell stated that he was going to tell the Detective the truth.

7   He claimed he was walking down the street and came upon Escareno being beaten and kicked on the

8   ground. He stated he took money from Little Dean but that he himself had not gone into Escareno's

9   pockets. (*Id.* at 349-50, 360, 364.)

10   Muhammad argued in state court that Odell's statements were "significant in establishing the

11   robbery-murder allegations because he acknowledged that money was taken from Escareno during the

12   assault." (LD No. 2 at 42.) As previously discussed, however, there was significant other evidence

13   admitted at trial besides Odell's statements, however, which established that money was taken from

14   Escareno during the assault. Pierson testified he saw two of the individuals who attacked Escareno

15   going through Escareno's pockets and heard change fall out. (Rep's Tr., vol. 18 at 5155-56.) Detective

16   Haroldsen testified Pierson told him that her heard one of the attackers ask, "How much you got," and

17   saw Muhammad searching Escareno's pockets while he lay on the ground. (Rep's Tr., vol. 21 at 6105,

18   6114.) Paramedic Mendizabal testified that Escareno's right pants pocket was turned inside out and

19   there was some change inside his jacket and on the ground around him. (*Id.* at 6140-41, 6152.) He also

20   testified that as they attended to him, Escareno appeared to try to move his hand in and out of his pocket.

21   (*Id.*) In both Pruitt's and Pierson's pretrial statements they stated that the individuals who attacked

22   Escareno went through his pockets as he lay on the ground. (Supp. Clerk's Tr., vol. 1 at 223, 249.) In

23   addition, the jury could have considered the assault and robbery of Delatorre about a week earlier, which

24   was conducted in much the same way as the assault of Escareno, as evidence of a common scheme or

25   plan which made robbery as the motive for the attack on Escareno much more likely. (Rep's Tr., vol.

26   30 at 8754-55; vol. 31 at 9008-09.)

27   In sum, the Court concludes that even if the admission of Odell Muhammad's statements

28   violated Raheem Muhammad's due process rights, the error did not have a substantial and injurious

effect on the jury's verdict because there was sufficient evidence other than Odell's statements to support the allegation that the murder was committed during the commission of a robbery. Because the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, Muhammad is not entitled to relief as to this claim. *Williams*, 529 U.S. 412-13.

5.   *Denial of Access to Juror Information (Claim Five)*

Raheem Muhammad also joins in Odell Muhammad's argument that the trial court erred when it refused to permit him access to juror information in order to investigate and prepare a motion for new trial based on juror misconduct. (LD No. 13 at 16-19.) Specifically, Odell's counsel learned after the verdicts were pronounced that Juror No. 10 had been in an elevator with members of the Muhammad family during deliberations at which time she looked distraught and said to them, "It's hard." (Rep's Tr., vol. 38 at 11105.) Odell's counsel subsequently made a motion for juror information in order to determine whether Juror No. 10 had been subjected to improper pressure to render a guilty verdict. (*Id.* at 11105-08.) The trial court denied the motion, stating that motion and the supporting declarations by Muhammad family members did not warrant investigation or an evidentiary hearing. (*Id.* at 11108-09.) On appeal, the state appellate court analyzed the claim as follows:

> Where a party seeks a new trial based upon jury misconduct, the court must undertake a three-step inquiry. First, the court must determine whether the evidence presented for its consideration is admissible. (*People v. Duran* (1996) 50 Cal.App.4th 103, 112 (*Duran*).) Such evidence may include declarations from the jurors. (*Ibid.*) Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct. (*Id.* at p. 113.)

> ". . .The trial court may conduct an evidentiary hearing to determine the truth of the allegations set out in the declarations. [Citations.] 'The defendant is not entitled to such a hearing as a matter of right; the trial court has discretion to hold such a hearing.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a *strong possibility* that prejudicial misconduct has occurred. Even [then], an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such hearing.' [Citations.]" (*Duran*, *supra*, 50 CAl.App.4th at p. 113, citing *Hedgecock*, *supra*, 51 Cal.3d at pp. 415, 419, and *People v. Hord* (1993) 15 Cal.App.4th 711, 722-723.)

> Finally, if misconduct is found to have occurred, the court must determine whether the conduct was prejudicial. (*Duran*, *supra*, 50 Cal.App.4th at p.113.) Once misconduct has been established, prejudice is presumed; reversal is required unless the reviewing court

finds, upon examination of the entire record, there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.  (*Ibid.*)

. . . .

". . .[T]he trial court herein did not abuse its discretion when it denied appellants' motions for a hearing and disclosure of the jurors' personal information.  As noted by the trial court, the juror's statement — "It's hard" — was made in the context of an inadvertent encounter between the juror and members of appellants' family.  Such a comment, in the midst of lengthy deliberations in an extremely long trial, strongly implied an expression of sympathy to the family and did not raise any issues of misconduct, prejudice or bias.  Odell assets the juror's comment addressed the deliberative process and thus constituted misconduct as an inappropriate comment on deliberations.  Whether the juror's comment addressed the lengthy trial, the lengthy deliberations, or the simple fact that the women's teenage relatives were being tried for murder, her comment was still a sympathetic remark and does not raise the specter of jury misconduct or prejudice.  The court properly declined to conduct a hearing and did not abuse its discretion when it denied appellants' request for disclosure.

(LD No. 11 at 103-08.)

Under clearly established Supreme Court law, a defendant has a right to an impartial jury where jurors consider only the evidence which is presented to them in open court.  *Turner v. Louisiana*, 379 U.S. 466, 472-473, (1965); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  In cases where jury tampering or other serious juror misconduct is alleged, a hearing regarding the allegations may be appropriate.  *See Remmer v. United States*, 347 U.S. 227 (1954).  However, "'[a]n evidentiary hearing is not mandated *every* time there is an allegation of jury misconduct or bias.'"  *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003), quoting *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) (emphasis in original).  In determining whether to hold a hearing, "'the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source.'"  *Id.* quoting *Angulo*, 4 F.3d at 847; *see also United States v. Dutkel*, 192 F.3d 893, 894-95 (9th Cir. 1999) (holding that *Remmer* stands for the proposition that a hearing is mandated only in those circumstances where jury tampering is at issue).

As required by *Tracey*, the state trial judge considered "the content of the allegations, the seriousness of the alleged misconduct and the credibility of the source," and reasonably determined that the juror's comment, "It's hard," appeared to be "an expression of sympathy for...the family of the

06cv0549

defendants," or "a comment upon the task the jurors faced." (Rep's Tr., vol. 38 at 11108.) Given the apparent nature of the comment and the lack of any other evidence which would have supported a suggestion that juror misconduct had occurred, the state courts' denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

### 6.    *Ten-Year Determinate Term (Claim Six)*

Next, Raheem joins in Odell's argument that the prosecution waived its right to argue, for the first time on appeal, that the trial court's imposition of a two-year term for the gang enhancement should instead have been a ten-year determinate term. (LD No. 13 at 20-21.) The state appellate court agreed with the prosecution on appeal and modified the sentence accordingly. (LD No. 11 at 95-97.)

Respondent contends that this claim was raised and resolved solely on state law grounds and thus does not present a federal question, and the Court agrees. (Mem. of P. & A. Supp. Answer at 47-49.) Federal habeas corpus relief is not available for errors of state law. *See Estelle*, 502 U.S. at 72. Construing Muhammad's claim liberally, as this Court is required to under *Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 1001), Muhammad could state a federal constitutional claim by alleging that his federal due process rights were violated when he was vindictively sentenced more harshly after an appeal. *See Alabama v. Smith*, 490 U.S. 794, 801-03 (1989). But that is not what occurred here. Rather, as the state appellate court noted, during the pendency of Muhammad's appeal the California Supreme Court clarified that under California law, a trial court is required to impose a ten-year determinate sentence when a defendant is convicted of a violent felony and the jury finds the crime was committed for the benefit of a street gang. *See People v. Lopez*, 34 Cal.4th 1002, 1005-06 (2005). Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Muhammad is not entitled to relief as to this claim.

### 7.    *Consecutive Sentences (Claim Seven)*

Muhammad argues the imposition of consecutive sentences based on factual findings made by a judge and not by a jury violates the Sixth Amendment as defined in *Apprendi v. New Jersey* 530 U.S. 466 (2000) and its progeny. (Pet'rs Attach. D; LD No. 3 at 68.) The Supreme Court recently resolved

1    this issue against Muhammad in *Oregon v. Ice*, 555 U.S. __, 129 S.Ct  711, 714-15 (2009).

2    Accordingly, Muhammad is not entitled to relief as to this claim, as the state court's denial of the claim

3    was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

4    *Williams*, 529 U.S. at 412-13.

5    **V.      CONCLUSION**

6          Having carefully considered Muhammad's petition, Respondent's Answer and Memorandum

7    of Points and Authorities in Support of the Answer, all the documents and legal authorities submitted

8    by the parties, for all the foregoing reasons the Court **DENIES** the petition.  The Clerk of Court is

9    directed to enter a judgment denying the petition with prejudice.

10         **IT IS SO ORDERED.**

11   **DATED:** February 24, 2009

12

13                                              MARILYN L. HUFF, District Judge

14                                              UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26

27

28